No. 17-4014

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA EX REL. GERALD POLUKOFF, M.D.,
Appellant,

v.

ST. MARK'S HOSPITAL, *ET AL.,*
Appellees.

On Appeal from the United States District Court
for the District of Utah Central Division,
Hon. Jill N. Parrish
No. 2:16-cv-00304

REPLY BRIEF

FLEMING, NOLEN & JEZ, LLP
Rand P. Nolen
TX SBN 00788126
George M. Fleming
TX SBN 07123000
Sylvia Davidow
TX SBN 05430551
Gregory D. Brown
TX SBN 24078266
David Hobbs
TX SBN 24074420
Jessica A. Kasischke
TX SBN 24083294
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
(713) 621-7944
(713) 621-9683 (Fax)

GOLDSTEIN & RUSSELL, P.C.
Thomas C. Goldstein
MD SBN 199512120307
Tejinder Singh
MD SBN 201507200004
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Tel: 202-362-0636

**Counsel for Appellant**

**Oral Argument Requested**                                  **November 2, 2017**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

GLOSSARY ................................................................................................. vii

REPLY BRIEF ..............................................................................................1

I. The Medical Necessity Issues in this Case Are Neither Subjective nor Ambiguous, and it Is Black Letter Law that a Treating Physician Cannot Determine Necessity on His Own. .....................................................2

II. Scientific Ambiguity Does not Defeat the Allegation of Falsity in this Case. ........................................................................................................11

III. The Complaint Pleads Scienter. ......................................................19

IV. The Complaint States Valid Claims Against the Hospital Defendants. .........27

    A. St. Mark's Is Liable. ...................................................................27

    B. Intermountain Is Liable. .............................................................31

V. This Court Should Reject Intermountain's Constitutionality Argument. ........35

CONCLUSION ............................................................................................37

CERTIFICATE OF COMPLIANCE ..................................................................39

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS 39

CERTIFICATE OF SERVICE .........................................................................40

## TABLE OF AUTHORITIES

**CASES**

*Almy v. Sebelius*,
679 F.3d 297 (4th Cir. 2012) ...................................................................3, 12

*Bishop v. Wells Fargo & Co.*,
870 F.3d 104 (2d Cir. 2017) ..........................................................................6

*Chesbrough v. VPA, P.C.*,
655 F.3d 461 (6th Cir. 2011) .........................................................................8

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*,
561 U.S. 477 (2010)......................................................................................35

*Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*,
467 U.S. 51 (1984)........................................................................................20

*HTC Corp., v. IPCom GmbH & Co., KG*,
667 F.3d 1270 (Fed. Cir. 2012) ...................................................................17

*Huber v. Taylor*,
469 F.3d 67 (3d Cir. 2006) ...........................................................................18

*Latham v. First Marine Ins. Co.*,
16 F. App'x 834 (10th Cir. 2001)..................................................................17

*Minn. Ass'n of Nurse Anesthetists v. Allina HealthSys. Corp.*,
276 F.3d 1032 (8th Cir. 2002) ......................................................................22

*Morrison v. Olson*,
487 U.S. 654 (1988)......................................................................................35

*New Orleans Depot Servs., Inc. v. Dir., Office of Worker's Comp. Programs*,
718 F.3d 384 (5th Cir. 2013) ........................................................................18

*Singleton v. Wulff*,
428 U.S. 106 (1976).......................................................................................17

*State of N.Y. on Behalf of Bodnar v. Sec'y of Health & Human Servs.*,
903 F.2d 122 (2d Cir. 1990) ...............................................................22

*United States ex rel. Aranda v. Cmty. Psychiatric Centers of Okla., Inc.*,
945 f.Supp.1485 (W.D. Okla. 1996) .......................................10, 15

*United States ex rel. Geschrey v. Generations Healthcare, LLC*,
922 F. Supp. 2d 695 (N.D. Ill. 2012)......................................................8

*United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*,
115 F. Supp. 2d 35 (D. Mass. 2000)......................................................9

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*,
614 F.3d 1163 (10th Cir. 2010) ...........................................................30

*United States ex rel. Mikes v. Straus*,
274 F.3d 687 (2d Cir. 2001) .........................................................6, 33

*United States ex rel. Morton v. A Plus Benefits, Inc.*,
139 F. App'x 980 (10th Cir. 2005)..........................................................8

*United States ex rel. Nowak v. Medtronic, Inc.*,
806 F. Supp. 2d 310 (D. Mass. 2011)....................................................9

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
857 F.3d 1148 (11th Cir. 2017) ...........................................................22

*United States v. AseraCare Inc.*,
176 F. Supp. 3d 1282 (N.D. Ala. 2016) .................................................8

*United States v. Augustine Med., Inc.*,
No. CRIM03-3211-8ADM/AJB, 2004 WL 256772 (D. Minn. Feb.
10, 2004) ...............................................................................................9

*United States v. Krizek*,
111 F.3d 934 (D.C. Cir. 1997)..............................................................29

*United States v. Mackby*,
261 F.3d 821 (9th Cir. 2001) ...............................................................20

iii

*United States v. McLean*,
715 F.3d 129 (4th Cir. 2013) ........................................................7

*United States v. NHC Healthcare Corp.*,
115 F.Supp.2d 1149 (W.D. Mo. 2000) ......................................10

*United States v. Patel*,
485 F. App'x 702 (5th Cir. 2012) .................................................7

*United States v. Paulus*,
No. CR 15-15-DLB-EBA, 2017 WL 908409 (E.D. Ky. Mar. 7, 2017) ........................................................................................7, 8

*United States v. Prabhu*,
442 F. Supp. 2d 1008 (D. Nev. 2006) ..........................................7

*United States v. Vista Hospice Care, Inc.*,
No. 3:07-CV-00604-M, 2016 WL 3449833 (N.D. Tex. June 20, 2016) ..............................................................................................8

*Universal Health Servs., Inc. v. United States ex rel Escobar*, 136 S. Ct. 1989 (2016).....................................................16, 17, 18, 19, 20

*Vt. Agency of Natural Resources v. United States ex rel. Stevens*,
529 U.S. 765 (2000)......................................................................36

## STATUTES & RULES

31 U.S.C. § 3729(a)(1).......................................................................15

31 U.S.C. § 3729(a)(1)(A) ................................................................19

31 U.S.C. § 3729(a)(1)(B) ................................................................19

31 U.S.C. § 3729(a)(2).......................................................................15

31 U.S.C. § 3729(b)(1).......................................................................20

31 U.S.C. § 3730(b)(4)...............................................................................37

31 U.S.C. § 3730(c)(2)...............................................................................37

31 U.S.C. § 3730(c)(3)...............................................................................37

42 U.S.C. § 1395f(a)(7)(A)(i)(II)..................................................................8

42 U.S.C. § 1395*l*(e).................................................................................12

42 U.S.C. § 1395y(a)(1)(A)........................................................................33

42 C.F.R. § 411.406(e)..............................................................................21

42 C.F.R. § 424.5(a)(6).............................................................................12

52 FED. REG. 15560 (1987).........................................................................3

54 FED. REG. 4301 (1989)...........................................................................3

60 FED. REG. 48417 (1995)..........................................................................3

FED. R. CIV. P. 9(b) ...............................................................2, 27, 30, 33, 34

## OTHER

S. Rep. No. 99-345 (1986) ........................................................................29

BLACK'S LAW DICTIONARY
    (10th ed. 2014)....................................................................................15

*In the Case of Bionicare Med. Techs., Inc.,*
    No. M-09-415, 2010 WL 2994377 (H.H.S. Mar. 17, 2010) .........................3

*In the Case of Collier Anesthesia,*
    No. M-12-2553, 2012 WL 10067661 (H.H.S. Nov. 6, 2012) .......................6

*In the Case of D.D.H.,*
    No. M-13-1562, 2013 WL 10257267 (H.H.S. Aug. 22, 2013)................5, 13

*In the Case of Iowa Hospice, LLC*,
　　No. M-11-1465, 2013 WL 9744686 (H.H.S. Oct. 7, 2013) ...........................4

*In the Case of MP Totalcare/CCS Med.*,
　　No. M-11-1456, 2013 WL 9555043 (H.H.S. Sept. 12, 2013).......................5

*In the Case of Urology Ctr. of Fla.*,
　　No. M-10-1766, 2011 WL 7145382 (H.H.S. Oct. 18, 2011) .........................6

Medicare Benefit Policy Manual § 15.50.4.3 ......................................................3

Medicare Program Integrity Manual § 13.3...........................................................3

Medicare Program Integrity Manual § 13.5.1.........................................................3

Medicare Program Integrity Manual § 13.7.1.........................................................4

TCI SuperCoder, Medical Necessity Required to Correctly Bill
　　Appendectomy Add-on Code (Apr. 1, 2000),
　　https://www.supercoder.com/coding-newsletters/my-general-
　　surgery-coding-alert/medical-necessity-required-to-correctly-bill-
　　appendectomy-add-on-code-article ...........................................................23

**GLOSSARY**

| | |
|---|---|
| AHA | American Heart Association |
| ASA | American Stroke Association |
| ASD | Atrial Septal Defect |
| CMS | Centers for Medicare & Medicaid Services |
| FCA | False Claims Act |
| FDA | Food and Drug Administration |
| HHS | Health and Human Services |
| LCD | Local Coverage Determination |
| MPIM | Medicare Program Integrity Manual |
| NCD | National Coverage Determination |
| PFO | Patent Foramen Ovale |

# REPLY BRIEF

The operative complaint filed by Relator Dr. Gerald Polukoff alleges that defendant Dr. Sherman Sorensen performed thousands of medically unnecessary septal closure surgeries. Specifically, although the consensus in the medical community was that closure of a patent foramen ovale (PFO)—which one in four healthy Americans has—is indicated only, if ever, to prevent recurrent cryptogenic (*i.e.*, unexplained) stroke when less invasive drug therapies have failed, Sorensen performed those closures on patients who had never suffered a stroke. Similarly, even though the medical community did not regard PFO closure as an appropriate way to treat migraines, Sorensen performed the surgery for that purpose too. On many occasions, Sorensen falsified diagnoses and health records to make his closure surgeries appear legitimate. Sorensen and his co-defendants then billed many of those surgeries and related hospital services to the government, expressly and implicitly certifying their necessity in the process. Thus, the government paid Sorensen and his co-defendants millions of dollars for surgeries that Americans did not need—diverting valuable funds away from necessary medical care for others. That is a quintessential False Claims Act (FCA) violation, and as we and the United States explained in our respective briefs, defendants' motion to dismiss should have been denied.

Defendants' three briefs make largely the same responses. They all contend that (1) their certifications were not objectively false because the question of whether Sorensen's septal closures were "reasonable and necessary" is inherently subjective; (2) their certifications were not objectively false because the medical science regarding the propriety of septal closures was unsettled; and (3) they did not have scienter because they were sincere and/or ignorant of the fraud. The hospital defendants also make arguments specific to their liability under Rule 9(b), and Intermountain argues that the FCA's qui tam provisions are unconstitutional. We address these arguments in turn.

## I. The Medical Necessity Issues in this Case Are Neither Subjective nor Ambiguous, and it Is Black Letter Law that a Treating Physician Cannot Determine Necessity on His Own.

Defendants' principal argument is that their certifications to the government could not have been "objectively false" because, in the absence of a specific government directive deeming a particular service medically unnecessary, the medical necessity inquiry is subjective. They contend that a treating physician has the ability to make a medical judgment that a particular service is necessary, and, as a matter of law, his judgment can never be false.

This is wrong because the aspect of the medical necessity inquiry at issue here—whether a particular service is considered necessary to treat a particular condition—is not nearly as subjective or flexible as defendants contend. The Centers

for Medicare and Medicaid Services (CMS) have issued manuals explaining that services are "reasonable and necessary" if they are "safe and effective," "not experimental or investigational," and "appropriate"—including because they are "[f]urnished in accordance with acceptable standards of medical practice for the diagnosis or treatment of the beneficiary's condition." Medicare Program Integrity Manual (MPIM) § 13.5.1; *see also* Medicare Benefit Policy Manual § 15.50.4.3 (explaining that "reasonable and necessary" determinations are made "with reference to acceptable standards of medical practice").[1] The Department of Health and Human Services' adjudications explain that "the relevant tests for applying these terms are whether the item or service has been proven safe and effective based on authoritative evidence, or alternatively, whether the item or service is generally accepted in the medical community as safe and effective for the condition for which it is used." *See In the Case of Bionicare Med. Techs., Inc.*, No. M-09-415, 2010 WL 2994377, at *3 (H.H.S. Mar. 17, 2010) (citing 54 Fed. Reg. 4301 (1989); 60 Fed. Reg. 48417 (1995); 52 Fed. Reg. 15560 (1987)).

The existence of published authoritative evidence, and of general acceptance in the medical community, are objectively verifiable facts that a jury can decide. As

---

[1] These standards apply whenever there is no National Coverage Determination (NCD) in place. They govern both Local Coverage Determinations (LCDs) and individual claim adjudications. *Almy v. Sebelius*, 679 F.3d 297, 304 (4th Cir. 2012) (citing MPIM § 13.3).

CMS explains, the way to find the relevant evidence is to search "published scientific literature for any available evidence pertaining to the item or service in question." MPIM § 13.7.1. Determinations should be based on "[p]ublished authoritative evidence derived from definitive randomized clinical trials or other definitive studies," or in the alternative on:

General acceptance by the medical community (standard of practice) as supported by sound medical evidence based on:

- Scientific data or research studies published in peer-reviewed medical journals;

- Consensus of expert medical opinion (*i.e.*, recognized authorities in the field); or

- Medical opinion derived from consultations with medical associations or other health care experts.

*Id.* Thus, CMS's guidance sets forth objective tests, and also explains what types of evidence may satisfy the tests.

This same guidance explicitly rejects defendants' argument that a doctor's subjective belief can determine medical necessity: "Acceptance by individual health care providers, or even a limited group of health care providers, normally does not indicate general acceptance by the medical community." *Id.* Indeed, CMS consistently has ruled that no presumptive weight should be assigned to a treating physician's medical opinion in determining medical necessity. *See In the Case of Iowa Hospice, LLC*, No. M-11-1465, 2013 WL 9744686, at *8 (H.H.S. Oct. 7, 2013)

(citing CMS Ruling 93-1, which applies to Medicare Part A); *In the Case of MP TotalCare/CCS Med.*, No. M-11-1456, 2013 WL 9555043, at *3 (H.H.S. Sept. 12, 2013) (noting treating physician rule was rejected with respect to Medicare Part B).

These authorities conclusively refute defendants' argument that "medical necessity in the present case is a question of the treating physician's medical judgment." Intermountain Br. 26; Sorensen Br. 2-3. Instead, as CMS's manuals and decisions show, the necessity question does not turn on what any individual physician thinks, but instead on what the medical community has already accepted.[2] While a physician's certification is a necessary part of the reimbursement process (because without it, necessity cannot be found), we are not aware of any case in which such a certification was deemed sufficient to establish necessity. Indeed, CMS's Medicare Appeals Council has routinely rejected claims for reimbursement despite a physician's subjective belief that the service in question was necessary, even when there was no NCD or similar guidance in place. *See, e.g.*, *In the Case of D.D.H.*, No. M-13-1562, 2013 WL 10257267, at *4 (H.H.S. Aug. 22, 2013) (denying coverage for a surgical procedure due to the lack of evidence indicating that it was

---

[2] St. Mark's appears to agree. That hospital's brief argues that "[t]he statutory right to reimbursement turns on whether treatments are 'reasonable and necessary' not whether the provider *believes them to be*," and that a "[t]he government . . . has never granted or denied any claim based on conclusions about the provider's personal, subjective beliefs." Br. 39-40.

generally accepted in the medical community, while acknowledging "that the beneficiary has researched and weighed the potential surgery at issue here, and that she is proceeding on the basis of medical advice"); *In the Case of Urology Ctr. of Fla.*, No. M-10-1766, 2011 WL 7145382, at *11 (H.H.S. Oct. 18, 2011) (finding insufficient evidence in the literature that a diagnostic technique was generally accepted, even though the physician argued that the service was "more than appropriate"); *In the Case of Collier Anesthesia*, No. M-12-2553, 2012 WL 10067661, at *5 (H.H.S. Nov. 6, 2012) (denying coverage when the supporting evidence represented "acceptance by an individual physician, which is not sufficient for coverage under the MPIM guidelines").

Tellingly, defendants do not cite a single case, guidance document from CMS, or any other authority, holding that the medical necessity standard is inherently subjective or indeterminate in the absence of procedure-specific guidance from the government.[3] The closest they come is to cite a criminal health care fraud case

---

[3] Indeed, some of the cases defendants cite clearly support our position. *See United States ex rel. Mikes v. Straus*, 274 F.3d 687, 698-99, 701-02 (2d Cir. 2001), *overruled on other grounds as stated in Bishop v. Wells Fargo & Co.*, 870 F.3d 104 (2d Cir. 2017) (holding that FCA claims based on the selection of unnecessary services—including claims revolving around "medical acceptance of a given procedure"—are cognizable, and further holding that applying the "reasonable and necessary" standard "does not obligate federal courts to step outside their primary area of competence and apply a qualitative standard measuring the efficacy of those procedures").

holding that in the absence of clear guidance, doctors in Nevada are permitted to make judgment calls about how to *document* the medical necessity of certain pulmonary rehabilitation services. *See United States v. Prabhu*, 442 F. Supp. 2d 1008, 1022 (D. Nev. 2006). But documentation standards are not the same as the standards for determining clinical necessity, and the procedures in *Prabhu* were admittedly clinically necessary. *Id.* St. Mark's also cites a criminal case holding that sometimes, patient-specific questions underlying a necessity determination may be subjective. *See United States v. Paulus*, No. CR 15-15-DLB-EBA, 2017 WL 908409, at *7 (E.D. Ky. Mar. 7, 2017) (holding that cardiologists reading angiograms could reasonably disagree over the amount of arterial blockage (stenosis), and therefore disagree about whether, for a particular patient, a stent was warranted).[4] But this case does not involve patient-specific diagnostic determinations of the type that physicians ordinarily make; it involves a deliberate and gross deviation from generally accepted medical practice.

Those cases therefore have no bearing on the question here, which is whether CMS would have deemed septal closures a medically necessary means to prevent a

---

[4] Contrary to the district court in *Paulus*, two courts of appeals have held that the degree of arterial stenosis is sufficiently objective to support a criminal conviction for the unnecessary use of stents. *See United States v. McLean*, 715 F.3d 129, 141 (4th Cir. 2013) (citing expert testimony to define standard of medical necessity); *United States v. Patel*, 485 F. App'x 702, 707-09 (5th Cir. 2012). The result in *Paulus* is also under appeal.

first stroke or a migraine. Indeed, the district court in *Paulus* effectively limited that case to its facts, and confirmed that "doctor[s] cannot hide behind the guise of subjective medical judgment" in every case. *Paulus* at *15. "Instead, where the necessity of the service is capable of confirmation or contradiction and the doctor's stated 'opinion' can be proven to be objectively false, that case (if proven beyond a reasonable doubt) can sustain a conviction." *Id.*

The rest of the cases defendants cite have nothing to do with medical necessity. *See United States ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980 (10th Cir. 2005) (unpublished) (holding that the custodial care provision of an ERISA plan was inherently ambiguous); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011) (holding that claims based on quality of radiology images set forth in industry standards did not implicate conditions of reimbursement); *United States v. AseraCare Inc.*, 176 F. Supp. 3d 1282, 1286 (N.D. Ala. 2016) (interpreting 42 U.S.C. § 1395f(a)(7)(A)(i)(II), which expressly calls for doctors to exercise "clinical judgment regarding the normal course of" a patient's illness); *United States ex rel. Geschrey v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 703 (N.D. Ill. 2012) (same); *United States v. Vista Hospice Care, Inc.*, No. 3:07-CV-00604-M, 2016 WL 3449833, at *3 (N.D. Tex. June 20, 2016) (same).

In contrast with the paucity of authority presented by defendants, our opening brief and the brief of the United States cited a litany of cases finding liability under

8

the FCA and under the criminal health care fraud statute for unnecessary services. Defendants attempt to distinguish these cases by arguing that the government had issued specific, controlling guidance in each of them. Sorensen Br. 29; Intermountain Br. 24-26; St. Mark's Br. 46-48. That is inaccurate.

For example, in *United States v. Augustine Medical, Inc.*, No. CRIM03-3211-8ADM/AJB, 2004 WL 256772 (D. Minn. Feb. 10, 2004), which we discussed at length (Opening Br. 40-41), there was no such guidance in place—but two of the defendant briefs never mention that case, and a third dismisses it as a case of obvious fraud, although the fraud was no more obvious than Sorensen's. Similarly, in *United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 348-49 (D. Mass. 2011), the district court denied a motion to dismiss the relator's claim that a medical device manufacturer had marketed devices for off-label use that were not medically necessary. The only specific guidance from the government provided that Category B medical devices are "reimbursable when used in an off-label use if 'medically necessary' or 'reasonable and necessary.'" *Id*. at 347. Thus, the government guidance in *Nowak* was no more specific than the guidance in CMS's manuals interpreting the phrase "reasonable and necessary" here. And in *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41 (D. Mass. 2000), the district court refused to dismiss a claim based on the allegation that the defendants performed two blood draws when they could have performed only one—even

though the defendants had argued that "no statute or regulation specifically prohibits the practice," and even though the subsequent blood tests were not "themselves medically unnecessary." The court did not rely on any regulation or clear government guidance; it relied on the common-sense understanding that a service is not medically necessary when it can be avoided.[5]

Some of the cases we cited did involve violations of specific government directives. But even in those cases, the distinction defendants seek to draw is illusory because none held that the result would have been different in the absence of government guidance, or that the medical necessity inquiry would become subjective or indeterminate in that circumstance. That makes sense, because CMS's guidance for determining medical necessity is clear enough for courts and juries to apply, and clear enough for doctors and hospitals to obey.

---

[5] Other cases go even further, denying motions to dismiss for failure to meet the standard of care even without a finding that the services were not "reasonable and necessary." *See, e.g.*, *United States v. NHC Healthcare Corp.*, 115 F. Supp. 2d 1149, 1153 (W.D. Mo. 2000) (denying motion to dismiss FCA claim alleging that "patients were not provided the quality of care which promotes the maintenance and the enhancement of the quality of life," even while acknowledging that "this is an amorphous standard in need of further clarification" later in the litigation); *United States ex rel. Aranda v. Cmty. Psychiatric Centers of Okla., Inc.*, 945 F. Supp. 1485, 148 (W.D. Okla. 1996) (denying motion to dismiss FCA claim alleging that psychiatric facility failed to conform to standard of care, and rejecting the defendant's argument "that it could not knowingly violate such vague standards").

Finally, assuming *arguendo* that the medical necessity inquiry might be subjective or rely on a physician's judgment in some cases—for example, because it is unclear whether a particular patient's symptoms manifest a generally accepted indication for a procedure—this case does not present that sort of close call. Here, the complaint does not allege or enclose *any* authoritative evidence (*i.e.*, a randomized clinical trial, peer-reviewed study, or similar document) concluding that PFO closures are ever indicated either as a treatment for migraines or for a patient who has not suffered a stroke—and it affirmatively refutes any suggestion that Sorensen's use of septal closures for those purposes constituted generally accepted practice in the medical community.

Consequently, the Court need not decide today whether the medical necessity inquiry is always objective in every respect. It would be enough to hold that in the absence of evidence that CMS would accept as sufficient to establish necessity, necessity is not present even if a treating physician urges otherwise. And as the MPIM and CMS decisions illustrate, that holding is already black-letter law, well-known to every reasonable health care provider.

## II. Scientific Ambiguity Does not Defeat the Allegation of Falsity in this Case.

Although they acknowledge that no authoritative evidence supports Sorensen's use of septal closures as a means to prevent first stroke or treat migraines, defendants maintain that no clear guidance rejected the use of septal closures for

those purposes either. Defendants argue that this silence somehow insulates them from liability because if the science was not settled, then Sorensen's justifications could not have been false. Sorensen Br. 31-34; Intermountain Br. 26; St. Mark's Br. 9-14. Actually, the opposite is true: absent evidence establishing the necessity of the services for those purposes, defendants could not in good faith have certified that very necessity. In this context, a lack of supporting evidence has the same legal significance as a consensus against defendants.

Defendants' argument wrongly inverts the applicable presumptions. Contrary to their position, the government does not have to specifically negate the necessity or reasonableness of services to render them ineligible for reimbursement. Nor does it have to demonstrate that the medical community has considered and rejected the service. Instead, the party seeking government funds bears the burden to determine, certify, and establish that the services are, in fact, reasonable and necessary as those terms are explained above. *See, e.g.*, *Almy*, 679 F.3d at 305; 42 U.S.C. § 1395*l*(e) (requiring providers to submit such information as is necessary to substantiate the amount due); 42 C.F.R. § 424.5(a)(6) (explaining that the claimant "must furnish . . . sufficient information to determine whether payment is due and the amount of payment"). The reason for this is clear: Medicare provides "limited, defined benefits. Not all items and procedures are covered, and the requirements for coverage include those designed to ensure that relatively new devices, procedures, and treatments will

have thoroughly demonstrated their safety and efficacy prior to being covered by Medicare." *D.D.H.*, 2013 WL 10257267, at *5. Consequently, if the published evidence and the general practice of the medical community do not embrace a service, the government does not have to take any further action to establish that the service is unnecessary or to deny payment. Defendants have not argued that the complaint concedes the existence of authoritative evidence or medical consensus supporting Sorensen's closures, and so their motion should be denied.

For much the same reason, if defendants are correct that "the guidelines and studies cited by Relator and included as exhibits to the [Complaint] demonstrate debate and uncertainty in the medical community about the optimal timing of PFO closures," St. Mark's Br. 27, they lose their motion to dismiss. Studies saying that it is unclear whether PFO closures are indicated for migraines and first strokes cannot support a finding that PFO closures are necessary for those purposes, and so the ambiguity defendants cite only proves that they falsely certified necessity in seeking reimbursement for the PFO closures in this case. To be sure, we have alleged and argued that the science was clearly against Sorensen—and we continue to believe, allege, and argue that the clear import of the American Heart Association and American Stroke Association (AHA/ASA) guidelines is that PFO closures are not

13

indicated for pre-stroke prevention or migraine prevention purposes.[6] But we do not need to win that fight to defeat this motion (or even to prove falsity at trial) because when, as here, there is *no authoritative evidence* supporting a service, and *no indication of general acceptance by the medical community*, then the service simply is not medically necessary under CMS's well-established standards.

In an effort to shift this burden away from themselves, defendants, and especially St. Mark's, argue that because the FCA is a punitive statute, it would not be fair to apply CMS's standards here. Paraphrased slightly, defendants argue that even if a claim to necessity is *wrong* because it is not supported by adequate scientific evidence, it is not *false* unless the government has issued specific guidance in the other direction. They contend that the opposite conclusion would transform

---

[6] Defendants urge the Court to consider the AHA/ASA guidelines in full and to take judicial notice of other guidelines, while criticizing us for citing those same guidelines and other medical evidence. We are happy for the Court to consider the guidelines in their entirety, as the truth is on our side. We also think judicial notice is unnecessary because we are citing the guidelines as authority to demonstrate the plausibility of our allegations—and not as evidence. For purposes of this appeal, it does not matter what evidence the Court examines because no defendant has cited any authoritative medical evidence from the relevant time period stating that PFO closures are an accepted way to treat migraines or prevent a first stroke. The best they can come up with is evidence refusing to take a position on this question—*i.e.*, evidence that cannot support a finding of necessity.

every debatable medical judgment into an FCA case, exposing health care providers to unwarranted liability.[7]

Defendants' argument is at odds with the text of the FCA, which creates liability for any "false or fraudulent" claim. 31 U.S.C. § 3729(a)(1), (2). The first dictionary meaning of the word "false" is "untrue," and in this context it plainly applies to any claim for reimbursement for unnecessary services. BLACK'S LAW DICTIONARY (10th ed. 2014); Opening Br. 9-10 (citing authorities for the proposition that claims for medical unnecessary services are "false"). This broad language leaves no room for defendants' rigid *per se* rule requiring the government to expressly prohibit reimbursement for specific procedures and indications. Such a rule would also expose the government to fraud at the hands of unscrupulous providers exploiting gaps in the government's coverage decisions. As the opening brief explained (at 24), the trend has been to shift away from NCDs and toward more local control. And case-by-case adjudication is still far more common than LCDs. Thus, there will be many situations where opportunistic physicians like Sorensen

---

[7] St. Mark's argues that the proper way to adjudicate necessity determinations is through Medicare's appeals and enforcement processes. But as the opening brief explained, the FCA is the government's principal tool to obtain redress for health care fraud. Moreover, courts have long rejected the contention that the administrative regime displaces FCA liability. *See, e.g.*, *Aranda*, 945 F. Supp. at 1489.

can locate a gap in the government's coverage decisions and abuse it to enrich themselves.

Defendants' rule, if adopted, would insulate all of those frauds from enforcement. If the government responds by issuing more coverage decisions, that risks two undesirable side effects. First, the government and its contractors would have to expend considerable resources to craft and implement those coverage decisions, and so the health care system would have to bear those costs. And second, the government could end up denying coverage in situations where it actually might be medically necessary, imposing hardship on beneficiaries. The FCA should not be interpreted to impose such costs on the government and its programs.

To be sure, there is a difference between an innocent mistake and a lie. But as we and the United States have both explained, the difference does not relate to the falsity element of an FCA claim (which can be satisfied by either); it relates to scienter (which precludes liability for reasonable innocent mistakes). Opening Br. 32-33; U.S. Br. 17-18. Defendants' plea for a narrow interpretation of the word "false" is a version of the argument the Supreme Court unanimously rejected in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), when it held that "[i]nstead of adopting a circumscribed view of what it means for a claim to be false or fraudulent, concerns about fair notice and open-ended liability can be effectively addressed through strict enforcement of the Act's

materiality and scienter requirements." *Id.* at 2001-02 (quotation marks omitted). Defendants argue that *Escobar* did not reject the "objective falsity" requirement specifically. But the Court was directly addressing the very concern defendants raise here, *i.e.*, that reading the statute to take its natural meaning would punish innocent conduct and undermine predictability in the provision of health care services. *See id.* at 2002.

A brief word is in order about whether the FCA requires proof of objective falsity at all. As we and the United States both explained, it does not. Opening Br. 29-33; U.S. Br. 12-14. Defendants note this issue was waived below because the response to the motion to dismiss included a single sentence agreeing that objective falsity was required. But this Court has the power to excuse that waiver, *see Singleton v. Wulff*, 428 U.S. 106, 121 (1976), and it should readily do so for four reasons:

**First**, this is a purely legal question about the meaning of the FCA, which will inform a large number of cases. To decide the question incorrectly risks creating bad law that will impair the government's interest in law enforcement. *See Latham v. First Marine Ins. Co.*, 16 F. App'x 834, 840 (10th Cir. 2001) (unpublished) (considering "pure question of law" raised for the first time on appeal); *HTC Corp., v. IPCom GmbH & Co., KG*, 667 F.3d 1270 (Fed. Cir. 2012) (waiver may be excused to adjudicate a "pure question of law" if "refusal to consider it would result in a

17

miscarriage of justice," or when "the issue presents significant questions of general impact or of great public concern"); *Huber v. Taylor*, 469 F.3d 67, 74-75 (3d Cir. 2006) (explaining that the court is "reluctant to apply the waiver doctrine when only an issue of law is raised"; and that waiver doctrine exists so that the parties can present all evidence they believe relevant, so that when only legal issues are involved, the purpose is not implicated).

**Second**, excusing the waiver will not prejudice defendants, who filed three separate briefs, thus preserving three full and fair opportunities to defend the district court's conclusion. *See New Orleans Depot Servs., Inc. v. Dir., Office of Worker's Comp. Programs*, 718 F.3d 384, 388 (5th Cir. 2013) (en banc) (holding that "a well-settled discretionary exception to the waiver rule exists where a disputed issue concerns a pure question of law"; and reaching a waived question when "every party was provided an adequate opportunity to brief and argue the issue" on appeal).

**Third**, at the time Dr. Polukoff agreed with defendants regarding objective falsity, the import of the Supreme Court's *Escobar* decision for this question was not yet fully clear. But as the law has continued to evolve, the wrongness of the district court's narrow understanding of "falsity" has become more apparent.

**Last**, a concession that objective falsity is required—made in a single sentence without elaboration in the district court—should not be interpreted as a concession that a statement of opinion can never be actionable under the FCA.

Indeed, even St. Mark's stated that it has "no quarrel" with the proposition that "statements of opinion can be 'false,'" in certain circumstances. St. Mark's Br. 38-39. And as the United States explained (at 13-14), words like "objective" can mean different things in different contexts. So the Court should construe any waiver narrowly, and tread lightly before relying on waiver doctrine to interpret the FCA.

For those reasons, the Court should excuse any potential waiver and interpret the statute in light of *Escobar*. When it does so, it should correct the district court's misimpression that only objectively false statements are actionable. As explained in our opening brief, opinions can be actionable as common-law frauds in at least two circumstances: (1) if the opinion is not actually held; or (2) if the statement of opinion implies underlying facts or an underlying basis for the opinion. These theories provide alternative bases for holding that at least some of defendants' representations in this case were false because it would not be reasonable for Sorensen or his co-defendants to express even an opinion that septal closures were "necessary" to prevent strokes or treat migraines.

## III. The Complaint Pleads Scienter.

The FCA imposes liability when a defendant acts "knowingly." 31 U.S.C. § 3729(a)(1)(A), (B). The word "knowingly" can mean "actual knowledge," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information," and does not require any "proof

19

of specific intent to defraud." *Id*. § 3729(b)(1). Thus, a defendant can violate the FCA by recklessly or ignorantly submitting a false claim to the government—even if he believes that the claim is valid—if a reasonable person would have known otherwise. *See Escobar*, 136 S. Ct. at 2001-02.

In this case, the complaint alleges that Sorensen and his co-defendants submitted false claims for services that they knew were not medically necessary. At a minimum, they recklessly disregarded or were deliberately ignorant of the lack of authoritative evidence supporting these services, and of the lack of general acceptance in the medical community.

Holding defendants liable in this circumstance is in no way unfair. As the Supreme Court has explained, "[p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law," and so defendants "could expect no less than to be held to the most demanding standards in [their] quest for public funds." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984). Moreover, as "participant[s] in the Medicare program, [defendants] had a duty to familiarize [themselves] with the legal requirements for cost reimbursement." *Id.* at 64; *see also United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (holding that defendant who "fail[ed] to inform himself of" Medicare requirements "acted in reckless disregard or in deliberate ignorance of those

requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question").

One core requirement is that services must be reasonable and necessary. CMS's guidance, including the MPIM, which sets forth the criteria for determining when a service will be deemed reasonable and necessary, are available to all providers. And CMS regulations require health care providers to familiarize themselves with acceptable standards of practice. Thus, under the regulations a provider will be deemed to know that particular services are not "reasonable and necessary" based on "experience, actual notice, or constructive notice," if, based on "[i]ts receipt of CMS notices, including manual issuances," or based on "[i]ts knowledge of what are considered acceptable standards of practice by the local medical community," the supplier "could have been expected to have known that the services were excluded from coverage." 42 C.F.R. § 411.406(e).

Defendants make two attacks on scienter. Both fail.

The **first** is a variant on their falsity argument. Defendants contend that because medical necessity is subjective in the absence of definitive guidance from the government, a defendant cannot knowingly make a false certification of necessity if he subjectively believes that the services are necessary. Intermountain makes the related argument that because the law concerning who decides whether services are necessary is unclear, a defendant cannot knowingly violate the law by

making that determination himself. These arguments are disposed of above by authorities showing clearly that medical necessity actually is objective in this context, and that the decision lies with CMS and its contractors—and not with a treating physician.[8] They are also at odds with recent precedents holding that "[a]lthough ambiguity may be relevant to the scienter analysis, it does not foreclose a finding of scienter. Instead, a court must determine whether the defendant actually knew or should have known that its conduct [was unlawful] in light of any ambiguity at the time of the alleged violation." *United States. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017); *see also Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002) (holding that if defendants certified compliance while knowing that the government did not adopt the same interpretation of an ambiguous requirement, then "any possible ambiguity" would be "water under the bridge," *i.e.*, irrelevant to the scienter determination).

Defendants' argument is also misguided because this is not a close case in which it would have been reasonable for defendants to believe that the services in question were necessary. In evaluating this point, it is important to remember that

---

[8] *See also State of N.Y. on Behalf of Bodnar v. Sec'y of Health & Human Servs.*, 903 F.2d 122, 125 (2d Cir. 1990) ("The Medicare statute unambiguously vests final authority in the Secretary, and no one else, to determine whether a service is reasonable and necessary, and thus whether reimbursement should be made.").

the question defendants were required to ask before submitting a claim for reimbursement is not whether the closure surgeries were permissible, or even whether they were beneficial for the patients. The question was whether the surgeries were *necessary as that term is understood by CMS*, *i.e.*, whether there was published authoritative evidence supporting their use for stroke or migraine prevention, or whether the medical community generally had accepted them for those purposes.[9]

Moreover, at the motion-to-dismiss stage, the question is narrower still, *i.e.*, whether the complaint itself somehow concedes that defendants reasonably believed that the closures were necessary. The complaint does no such thing. It does not identify any evidence, other than Sorensen's own self-serving conclusions parroted by a handful of doctors who worked with him and profited from PFO closures, even suggesting that such closures were appropriate for patients who had not suffered a stroke. As explained above, those opinions carry no weight. On the other side of the ledger, the complaint identifies the AHA/ASA guidelines, *i.e.*, rigorous, peer-

---

[9] As an analogy, it would not be irrational for a doctor to recommend that everybody have an appendectomy. The appendix is merely a vestigial organ, but ruptures can be life-threatening. Thus, a doctor could plausibly urge his patients who are healthy enough to undergo the surgery to have appendectomies. But the government would never regard such elective surgeries as necessary. *See, e.g.*, TCI SuperCoder, Medical Necessity Required to Correctly Bill Appendectomy Add-on Code (Apr. 1, 2000), https://www.supercoder.com/coding-newsletters/my-general-surgery-coding-alert/medical-necessity-required-to-correctly-bill-appendectomy-add-on-code-article ("Insurance carriers, including Medicare also will not reimburse the removal of a healthy appendix.").

reviewed studies based on the best available evidence that did not recommend closures as a prophylactic measure, as well as Intermountain's own PFO policy, which Sorensen was suspended for violating.

In defendants' **second** attack, they argue that Sorensen sincerely believed in the validity of his approach, and therefore did not act with scienter. They rely heavily on paragraph 145 of the amended complaint, which quotes from Sorensen's patient notes where he criticizes the AHA/ASA standard of care as "unethical" and indicates that he performs PFO closures as preventative measures on patients that he believes have an elevated risk of stroke. App. at 607.

As an initial matter, defendants mischaracterize the complaint. Although the complaint alleges that Sorensen made certain notes in his patient files professing certain beliefs and arguing that the prevailing standard of care is wrong, it does not allege that Sorensen's beliefs were sincere or voiced in good faith—as opposed to self-serving rationalizations for lucrative but unnecessary surgeries. Indeed, the word "sincere" never appears in the complaint. *Contra* St. Mark's Br. 49 (claiming that "the complaint affirmatively alleges that Dr. Sorensen was *sincere* in his medical views"); Intermountain Br. 33 (claiming that the "complaint pleads that Dr.

Sorensen (and his colleagues) *sincerely believed* in their approach to septal closures"); Sorensen Br. 20 (similar).[10]

In any event, for FCA purposes it does not matter whether Sorensen believed that his practice was a superior form of care, or whether he thought that the generally accepted approach of the medical community was "unethical." He was entitled to think those things—and before Intermountain prohibited him from doing so, he may even have been entitled to treat patients in accord with his idiosyncratic beliefs. But he was never entitled to demand that the government pay for those treatments, which it would not regard as necessary. Sorensen's statements prove that he knew that his practices were not generally accepted. And his actions speak even louder. The complaint alleges that Sorensen did not sincerely believe that his PFO closures were eligible for reimbursement, which is why he created false document trails "represent[ing] that the procedures had been performed based upon indications set

---

[10] Defendants argue that the complaint alleges that Sorensen did not indiscriminately close PFOs, but did so only for patients who he believed had an elevated risk of stroke from conditions like hypertension (high blood pressure). This argument misapprehends the significance of the allegation in the complaint in two ways. First, conditions like hypertension are extremely common—which means that Sorensen's limitations on who was eligible for PFO closure were essentially meaningless. Second, the published evidence indicated that PFO closure was appropriate, if ever, only for patients suffering from recurrent *cryptogenic* stroke, *i.e.*, stroke with no known cause. It did not conclude that PFO closure was indicated for hypertension. This allegation therefore spells out yet another way that Sorensen knowingly deviated from generally accepted medical practice.

forth in the [AHA/ASA] stroke guidelines—the existence of confirmed recurrent cryptogenic stroke." App. at 542; *id.* at 536 (alleging Sorensen would "recommend[] and perform[] PFO closures for patients without generally accepted medical indications on a routine basis," and then "falsely document in the medical records that the medical basis for the procedure was a history of strokes"); *id.* at 543 (indicating Sorensen disguised PFO closures as ASD closures "to disguise his fraud and make it harder to detect he fact that these closures and repairs were not medically reasonable and necessary"). Such allegations of deliberate concealment support a finding of scienter because they support a strong inference Sorensen knew that the government would refuse reimbursement had he told the truth.

Indeed, nothing in paragraph 145—or indeed any other part of the complaint—suggests that Sorensen sincerely believed that his approach had been generally accepted or supported by authoritative evidence, *i.e.*, published studies (as opposed to his own clinical experience and intuitions). On the contrary, the complaint alleges that defendants sought reimbursement even though they knew— or at least should have known—that no such evidence of necessity existed, and therefore knew (or should have known) that the government would not regard the services as necessary.

**IV. The Complaint States Valid Claims Against the Hospital Defendants.**

St. Mark's and Intermountain both argue that even if Sorensen violated the FCA, they cannot be held liable. St. Mark's argues that the complaint does not include sufficient allegations that it knew Sorensen's closures were unnecessary, nor that any improper closures were performed at St. Mark's. Intermountain argues that it did not cause Sorensen to submit false claims, submit false claims itself, or conspire with Sorensen to violate the FCA; it also raises arguments under Rule 9(b). Both hospitals are wrong.

**A. St. Mark's Is Liable.**

Sorensen performed unnecessary atrial septal closures at St. Mark's for approximately three years—and exclusively at St. Mark's after Intermountain suspended his privileges. The complaint alleges the following facts, all of which indicate that St. Mark's knowingly facilitated Sorensen's surgeries and also billed the government for follow-up procedures:

- St. Mark's billed the government for hospital services related to septal closures, which were unnecessary because the septal closures were unnecessary. App. at 544.

- Dr. Polukoff personally observed Sorensen perform medically unnecessary PFO closures at St. Mark's "on a routine basis," and then "falsely document in the

medical records that the medical basis for the procedure was a history of strokes." App. at 536.

- On other occasions, Sorensen documented in his notes that the PFO closures done at St. Mark's were for stroke prevention—an indication for which closure is not necessary. App. at 536.

- Dr. Polukoff personally explained to St. Mark's CEO and to his own physician liaison there that Sorensen had been performing unnecessary PFO closures, and that those closures led to Sorensen's suspension from Intermountain. *Id*. at 540, 610. St. Mark's responded by courting Sorensen's business. *Id*. at 540-41.

- The cardiologists at St. Mark's and Intermountain were intermingled, and many cardiologists practiced at both hospitals. Some of those cardiologists were vocal opponents of Sorensen's PFO procedures "and expressed their concern openly at St. Mark's at group meetings," including to "cardiologists, staff, and administration at St. Mark's." *Id*. at 608. The complaining physicians included the "managing partner at Heart Center, Dr. Pawan Sharma." *Id*. at 608-09.

- "The majority of patients at St. Mark's cardiac catheterization laboratory (the physical location where PFO closure operations are performed) came from Sorensen," whose volume "dwarfed all other cardiology business at St. Mark's." *Id*. at 609. Indeed, Sorensen's volume of closures alone—which outpaced other physicians by a factor of ten to twenty—was a "compliance red flag[]" that St. Marks

consistently "ignored," even as it took revenue from those very procedures. *Id*. at 507.

- "St. Mark's provided special treatment for Sorensen with staffing and scheduling in its catheterization lab, often to the detriment of true cardiac patients and other cardiologists. St. Mark's also provided open access for PFO industry representatives to the lab and personnel." *Id*. at 611.

- St. Mark's maintains a rigorous compliance program that requires its senior executives to monitor and approve its claims for Medicare and Medicaid reimbursement. *Id*. at 537-40.

Notwithstanding these detailed factual allegations, St. Mark's argues that it is not liable because the allegations show only that it knew of a disagreement between Sorensen and Intermountain, and not that it knew Sorensen was wrong. St. Mark's Br. 48-49. This contention elides the fact that St. Mark's never had a basis to think the procedures were necessary in the first instance—even though Medicare regulations required it to make a reasonable inquiry, and even though the FCA plainly imposes liability on defendants that "fail[] to make simple inquiries which would alert [them] that false claims are being submitted." S. Rep. No. 99-345, at 14, 22 (1986) (explaining why the "reckless disregard" provision was added to the FCA); *cf. United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (finding reckless disregard when physician failed to review fraudulent bills prepared by his

wife). Thus, Sorensen's suspension from Intermountain merely confirmed and highlighted St. Mark's ongoing failure to do what the law required.

St. Mark's argument also ignores the substance of what occurred at Intermountain. Intermountain did not merely determine that Sorensen's closures were *unnecessary*; it determined that they were *not even permissible*, and indeed a threat to patient health. App. at 533-34. Moreover, Intermountain did not reach that conclusion arbitrarily; it did so after a thorough internal review, and after consulting evidence-based guidelines. *Id.* at 534-35. So St. Mark's should have known that Sorensen's procedures were not medically necessary. But it responded by courting more of those procedures and allowing Sorensen to double his volume in its catheterization lab. *Id.* at 540-41.

St. Mark's also argues that the allegations against it are insufficient under Rule 9(b) because the complaint does not do enough to indicate which improper surgeries were performed at St. Mark's, versus at Intermountain. The district court appropriately rejected this argument because the complaint gives St. Mark's more than adequate notice of the nature of the allegations against it. "[C]laims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010).

Here, the complaint includes specific examples of false claims filed by Sorensen, drawn from his own billing data, as well as an allegation that his entire practice was concentrated at St. Mark's and Intermountain. Thus, each of Sorensen's false claims connects to one of those two hospitals. The hospitals, moreover, already know which claims relate to their patients; and even cursory discovery will allow Dr. Polukoff to attribute the claims to the correct hospital. The complaint also makes the further allegation that Dr. Polukoff personally watched Sorensen perform inappropriate closures at St. Mark's, and it includes enough representative examples of PFO closures billed to the government to at least create a reasonable inference that some of those latter surgeries were likewise billed for reimbursement. At this stage of the proceedings, that is more than enough.

## B. Intermountain Is Liable.

Intermountain's hospital-specific arguments fare no better. Sorensen practiced there from 2002 until 2011, performing more than 4000 PFO closures. App. at 533, 542. During those nine years, the administration at Intermountain knew of his prolific volume and also of complaints from practitioners and employees that Sorensen "was engaged in a practice of regularly performing unnecessary, invasive cardiac procedures on his patients." *Id.* at 533; *id.* at 535 (listing specific physicians who raised concerns about Sorensen). Indeed, "[f]or years, Sorensen leveraged Intermountain with the threat of moving elective patients to St. Mark's whenever

Intermountain personnel expressed concern with his practice." *Id.* at 609. In response, Intermountain attempted to keep Sorensen happy: "Sorensen was given his own catheterization lab room at Intermountain and provided with a handpicked staff of Intermountain employees. No other cardiologist received this type of special treatment." *Id.* at 610. Sorensen was also "permitted to violate IHC/Intermountain policy and have manufacturers representatives in the operating room and occasionally actually participating in his cases." *Id.* During this time, "Intermountain leadership, cardiologists and administrators were aware of Sorensen's special treatment and disregard for the rules; yet permitted this conduct for several thousand patients." *Id.* And like St. Mark's, Intermountain billed tremendous sums to the government and to private insurers for procedures related to Sorensen's surgeries. *Id.* at 544.

Intermountain argues that it did not even acquiesce in Sorensen's surgeries because in 2011 it adopted guidelines that limited his ability to perform PFO closures and then suspended Sorensen for violating those guidelines before revoking his privileges altogether. But that does nothing to account for the previous nine years, during which Intermountain did everything in its power to facilitate and profit from Sorensen's unnecessary surgeries. By adopting its internal guidelines, Intermountain conceded that Sorensen's procedures were not even permissible, let alone necessary.

32

But there was no good faith basis for Intermountain previously to have reached the opposite conclusion—and so Intermountain still is liable for its prior misconduct.

Intermountain argues next that its own claims were not false because it did not bill for Sorensen's services or certify their necessity. But when Intermountain submitted claims for hospital services connected to Sorensen's unnecessary surgeries, it submitted claims for unnecessary services. If a septal closure is unnecessary, then the follow-up visits and echocardiograms are also unnecessary, and equally culpable. Moreover, the Medicare statute expressly provides that services will not be reimbursed unless they are "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). Thus, a certification of necessity is at least implied in claims for reimbursement under that statute. *See, e.g., Mikes*, 274 F.3d at 701.

Additionally, Intermountain argues that it did not conspire with Sorensen, and that the conspiracy theory of liability has been waived. The opening brief did not discuss that theory in detail because the district court did not either—but Intermountain's feeble opposition lacks all merit. The complaint explains in detail that Intermountain and Sorensen collaborated to submit claims for his unnecessary surgeries to the government. That is enough to state a claim for conspiracy, and to make those two defendants jointly and severally liable for each other's false claims.

Intermountain's Rule 9(b) arguments fail for many of the same reasons as St. Mark's. Intermountain is wrong to argue that Dr. Polukoff had no familiarity with

its billing practices or with Sorensen's conduct prior to 2011: the complaint alleges that Dr. Polukoff himself principally worked at Intermountain beginning in 2008, and that as a cardiologist he observed and learned of Sorensen's practice even though he was not at the time employed by Sorensen. App. at 509. Moreover, the complaint alleges that unnecessary operations were performed on Medicare patients, and it alleges that Sorensen billed the government for unlawful closures, including examples from billing records and patient notes.

As explained in the opening brief, the fact that the complaint does not identify particular employees inside Intermountain's billing department who actually submitted false claims is not an impediment, since the complaint alleges that Intermountain was in the business of allowing these surgeries and related services to be performed on Medicare patients during the relevant time period. Opening Br. 47-50. Intermountain also does not dispute that knowledge may be pled generally, and that it is not necessary to identify a managing agent who knew of the fraud in order to establish its scienter. U.S. Br. 23-25. And Intermountain has sufficient notice of the claims against it to form a response because all of the details are within its possession.

Finally, also as explained in the opening brief (at 49-50), to the extent Rule 9(b) poses any obstacle, leave to amend should be granted freely—as it almost always is. In any event, the district court denied leave to amend on the manifestly

incorrect basis that the complaint does not allege an objectively false claim. If that holding is reversed, the district court should decide in the first instance whether further amendment is required or permitted. Defendants' alternative arguments for futility likewise miss the mark because, too, they are based on the flawed premise that the complaint concedes facts that it does not.

## V. This Court Should Reject Intermountain's Constitutionality Argument.

Intermountain argues that the *qui tam* provisions of the FCA violate the Executive Vesting, Take Care, and the Appointments Clauses of the Constitution. This argument boils down to an assertion that relators usurp governmental authority without sufficient oversight by the executive branch.

Every circuit that has considered these arguments has ultimately rejected them. Courts have noted that the FCA has a long pedigree, and that it is simply implausible that the statute would have stayed on the books for more than 150 years if it violated basic separation-of-powers principles.

Intermountain's argument also fails as a matter of logic because *qui tam* relators are not government employees and do not exercise government power. Indeed, Intermountain acknowledges that its Appointments Clause argument fails on this ground. But the inherent separation between relators and the government actually defeats all of Intermountain's claims. Unlike the independent prosecutor in *Morrison v. Olson*, 487 U.S. 654 (1988), or the board members in *Free Enterprise*

*Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477 (2010), *qui tam* relators do not exercise any executive power, nor hold any government office. They do not speak for the government. And they cannot modify its policies. The executive power thus remains vested in the President no matter what a relator does. And because the relator does not hold government office, the President does not need to have the power to remove the relator from his role as a private litigant.

Moreover, nothing in the cited constitutional clauses—or any decision interpreting them—limits Congress's power to create a private cause of action for defrauding the United States, which is all the FCA does. Indeed, it is commonplace for Congress to authorize parallel private and public enforcement of federal law. This is true of the antitrust laws, the securities laws, and even criminal law through the civil RICO statute, to name just a few examples. Intermountain's argument that relators are like law enforcement officers would necessarily implicate all of these regimes, critically undermining private enforcement of a swath of laws. The only plausible distinction one could draw between the FCA and these other statutes is that relators seek to remedy the government's injury, while plaintiffs in other contexts seek to vindicate their own injuries. But that is a distinction without any constitutional significance because, as the Supreme Court has explained, the government has effectively assigned its claim to the relator, *Vt. Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000), and none of

the cases interpreting the constitutional provisions Intermountain cites suggest that such assignments might be prohibited.

Intermountain's argument is also wrong because the FCA actually gives the government an unusual amount of control over litigation. The government has the option to intervene, and can do so belatedly for good cause. 31 U.S.C. § 3730(b)(4), (c)(3). Upon intervention, the government has almost unfettered power to dismiss or settle the action, or to take steps to limit the relator's participation. *Id*. § 3730(c)(2). Thus, to the extent the executive power clauses require the executive branch to retain the ability to control relators, the statute preserves that ability—indeed, to a far greater degree than the vast majority of causes of action to enforce federal law.

Finally, this argument is not properly before the Court, and the Court should not address it in the first instance. As the United States explained, the government must receive timely notice and an opportunity to intervene to defend the constitutionality of statutes, which did not occur in this case. The better approach would be to allow Intermountain to raise this argument in a summary judgment posture on remand, affording the United States has an adequate ability to respond, and the district court an opportunity to address Intermountain's argument in the first instance.

## CONCLUSION

This Court should reverse the judgment below.

Respectfully submitted,

By:   */s/ Rand Nolen*

Rand P. Nolen
TX SBN 00788126
George M. Fleming
TX SBN 07123000
Sylvia Davidow
TX SBN 05430551
Gregory D. Brown
TX SBN 24078266
David Hobbs
TX SBN 24074420
Jessica A. Kasischke
TX SBN 24083294
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
(713) 621-7944
(713) 621-9683 (Fax)
FLEMING, NOLEN & JEZ, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, Texas 77056-6109
Tel: 713-621-7944
Fax: 713-621-9638

Thomas C. Goldstein
MD SBN 199512120307
Tejinder Singh
MD SBN 201507200004
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Tel: 202-362-0636

**Counsel for Appellant**

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 8,879 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

The brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font size in Times New Roman.

Dated: November 2, 2017.        */s/Rand P. Nolen*

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing Reply Brief of Appellant, as submitted in Digital Form via the court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses by Symantec Endpoint, and according to the program, is free of viruses. In addition, I certify all required privacy redactions have been made.

Dated:  November 2, 2017        */s/ Rand P. Nolen*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2017, I electronically filed the foregoing document with the Tenth Circuit of Appeals using CM/ECF. I also certify that the foregoing document is being served this day to all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Rand P. Nolen*